We will now go back to our sitting, and we'll hear counsel in Secretary of Labor v. Doyle. And I think Mr. Doyle filed a motion to argue, and our rules are you have to be a member of the bar, so the clerk's office let him know that he couldn't come and argue. Yes, Your Honor. Good morning, Your Honors. My name is Marcia Bove. I represent the Secretary of Labor. I would like to reserve five minutes for rebuttal. Oh, all right. That's a long time, but okay. Cynthia Holloway and James Doyle marketed a multi-employer welfare fund, health fund, that targeted small employers who believed the money they paid into the fund would be used to buy health care benefits for their employees. During the two years the fund operated, Mr. Doyle collected $6.6 million from small employers, and he diverted $4.7 million of that amount to himself and others for marketing and other fees that were never disclosed to these employers. Predictably, the fund collapsed into insolvency, leaving millions of dollars of unpaid claims. I thought all the claims were eventually paid. I'm sorry, Your Honor? I thought all the claims were eventually paid. No, there's no evidence that any of the unpaid claims were repaid. There is no evidence of that in this record. Should there have been? No, Your Honor. That question is not relevant to the ultimate issue of liability in this case. The ultimate issue of liability in this case is whether the defendants diverted plan assets and whether the claims were ultimately, there is no evidence that the claims were paid, but the issue is whether plan assets were diverted. And the court did not make a finding of fact on what was a plan asset, is that correct? What the court failed to make findings on, the one issue that we, the legal errors that we're addressing here are the court's failure to apply the appropriate standard of care to the facts that it found concerning Cynthia Doyle's fiduciary conduct. The court failed to apply an appropriate standard of care to that conduct. The court failed to make any, to address the secretary's plan asset argument, and the court failed to address Mr. Doyle's fiduciary status, and the court failed to address whether he diverted plan assets. Are you claiming, because I didn't see it there and I looked, that somebody stole this money? What the secretary is alleging here is that Mr. Doyle diverted plan assets and that Cynthia Holloway Did he keep them for himself? He kept approximately 2.1 million. He set up, he created a system where plan assets were paid in two checks. One check was initially, he asked the participating employers to write one check to participate in the fund. And after they initially enrolled, he asked them to write two checks. The two checks equaled the amount of the initial enrollment, the initial enrollment amount. He asked them to make out one check to his operating company, and he pocketed that entire amount, that amount over the liability period, to 2.1 million dollars. When you say he pocketed, we don't have a made-up situation here. I don't see anything in the brief that has the Secretary of Labor suggesting that Mr. Doyle took this for himself. Am I wrong? I mean, I kept looking for it. I expected it, and I didn't see it. Well, Your Honor, the district court did not reach the question of what constituted plan assets. The secretary's position is that My question is, did he take them, whatever you call them? Did he take the money? I don't see any claim by the Secretary of Labor that maybe I'm wrong. Your Honor? Does what is a plan asset have to be determined before it can be determined whether he took something? Yes. Well, as to Mr. Doyle, that's true. As to Cynthia Holloway, it's a different analysis, which I'll come back to in a minute. But as to Mr. Doyle, the district court first needed to address what constituted a plan asset. And if the district court didn't address that, did you go back and ask the district court to do that? I mean, are we supposed to do that in the first instance? Well, Your Honor, this could be remanded to ask the district court to make that determination. But we do believe there are adequate facts in the record to allow this court to make that determination. It could be remanded, but the evidence in the record shows that although ERISA doesn't specifically define plan assets, plan assets are generally defined under ordinary notions of property law. And the question is whether the fund had a beneficial interest in the money that was collected by Mr. Doyle and under the party's understanding whether under ordinary notions of property law, the money that the employers paid to enroll in this fund should have been treated as plan assets. We believe that all of the money should have been treated as plan assets because the fund, under the governing documents, the only document that the participating employers ever saw was what was termed a new business enrollment form, which is- Is it your position that none of the money that went to either third-party administrators or health care providers should have gone to them? Oh, no, Your Honor. There is approximately, I believe it's about $2.7 million that ultimately reached the plan administrator, and that is the entity that actually paid the claims during the two years that this fund operated. There were actually four plan administrators, one of whom appeared to have paid virtually no claims and left the fund. Well, that goes to Holloway. Yes, that's correct, Your Honor. I get that, but- What we're saying is the money that Mr. Doyle diverted to pay himself a marketing fee of approximately $2.1 million and money that was also diverted from Check One, which was intended to- the Pitwoo Fund, the health fund, money was also diverted from that check, and we're saying that he should not have paid himself a marketing fee and no money- Okay, so no money should have gone to PCMG. That's right, Your Honor. That's 2.1. I understand. That is our position because this marketing scam, this marketing fee, had been enjoined by several states almost immediately from the inception of the fund. The first state to enjoin Mr. Doyle's activities was the state of Oklahoma. Before we get to the state of Oklahoma, I just want to make sure that I understand. So I understand the 2.1 that went to PCMG should not have gone. That's our position. Right. And that money should have gone where? To whose benefit? That money should have gone to the plan administrator to be held in trust for the benefit of the participating employers, and it should have been used to pay benefit claims. Okay, and it's your position as well that regardless of what services may have been provided by PCMG, what you just said with regard to the path of the money, the money should not have gone to PCMG. Yes, our position is that no money should have gone to PCMG because Mr. Doyle provided no services to this fund. How can those be plan assets if they never got to the plan? But they're plan assets based on ordinary notions of property law. If the fund had a beneficial interest, you look at what did the parties know. The participating employers in this case saw only the new business turn in form. It required that they pay an aggregate amount to be enrolled in the fund, and that amount was equal to the two checks combined that Mr. Doyle had them write after he initially enrolled them in the fund. When he initially enrolled them in the fund, they paid with one check, which Mr. Doyle deposited into his own operating account and then disbursed. That money obviously... Disbursed how? The initial lump sum payment... Yeah, you said disbursed. I'm just asking you on that question. Did he disburse any of it to pay any of the claims? He forwarded the money that was intended for the fund to a company called PCMG, and PCMG took additional... Don't worry about the red light because we want to question you. Oh, I'm sorry, Your Honor. Don't worry about it. Yeah, it's a green light. Keep going. Okay. Until we stop you. Mr. Doyle never disclosed to the participating employers that any money would be deducted. The question we're asking is where did the money go? Well, the money flowed first to Mr. Doyle. Every penny flowed first to Mr. Doyle, and he testified that with respect to the initial payment, he deposited it into his operating account. Then he forwarded a part of it to PCI Northpoint. PCI Northpoint then forwarded a part of it to the trust fund. But as of November of... He kept a large part, but as of November of 2002, this company called PCI Northpoint that was essentially a piece of paper just ceased operating. From at least November of 2002 until May, approximately May of 2003, Mr. Doyle, although he had the participating employers write two checks, one payable to the Pitt & Wu Fund and one payable to his own operating company, he deposited both of those checks into his own operating account. He then forwarded money to the trust fund himself, and he kept some amount of the check that was written out that was made payable to the trust fund. And we know that based on the district court's own findings. But this money was money that was supposed to go to providers of health services ultimately, right? Yes. That's all the employees knew. That's what they care about. And are you saying that there are providers who still haven't been paid? There are claims that still haven't been paid, Your Honor. How much claims? Well, our summary exhibits showed as of October of 2002, 7.6. No, as of now. As of now. It's still unpaid, Your Honor. There's no evidence that any of the amount that was unpaid as of October of 2002 has been paid. Gee, that wasn't my understanding. Go ahead. I'm following up on this, okay? Go ahead. So I'm not getting the math here. We started off with $6.6 million, right? Yes, Your Honor. You and I in our discussion earlier said that a certain amount of money, I believe you said $2.7 million, right? $2.7 million went to third-party administrators. And at least some of that money went on to be paid to health care providers.  Yeah? Is that not right? I'm sorry. We estimate that $3.1 million was intended to be paid to the fund. No, I understand. $3.1 was intended. $2.1 on check one went to them, and then later $645,000 approximately also went. So when I say $2.7, I'm $2.1 and then $645,000. That's how I get to my number. All I want to know is, you know, you just told Judge Slover that none of the money went where it should have gone. And I thought we had said earlier that $2.7 of it went to where it should have gone. Well, Your Honor, let me try it this way. Okay. Mr. Doyle collected $6.6 million, and $4.5 of that was made payable to the fund. Directly, expressly payable to the fund? Yes, Your Honor. We looked at the checks and did summary charts, and our estimate is that $4.5 of the money was made payable in checks to the trust fund. Okay. Now, is it legally, because there are various cases that discuss this, aren't there, that it was made payable to the fund, but it never got to the fund? Well, of that $4.5 Is it your position that that's a fund asset? Our contention is at least check one made payable to the fund was a fund asset, was plan assets. And of that $4.5 million that was in check one, only 3. I'm sorry, I correct my 2.7. It's $3.1 million that got to the fund. And does it really matter where the rest went as long as it didn't get to the fund? Yes, that's correct, Your Honor. The crucial issue as to the role of the trustee is to make sure that everything gets to the fund. That's correct, Your Honor. And to the extent it doesn't get to the fund, that's a breach of fiduciary duty, and that's what you're concerned about? Yes, Your Honor. Rather than the ultimate destination of whose pocket it may have gone into. Well, that's correct. So your position is that even if it goes into the right pocket, following up on Judge Roth's question? No, because the right pocket is the fund. The right pocket is the fund. It has to get to the fund. But if it gets to health care providers, your position is that's still wrong? It only gets to health care providers through the fund. No, that's the way I wanted to go. I just want to know what her position is. If it gets to the health care providers circuitously, is it still a violation? That's my question. Well, it should follow. Section 403 of ERISA requires that plan assets be held in trust, and that's one of the problems here. But the question, of course, is whether these are plan assets, but that's an underlying question. And that's what the district court maybe should have done but didn't do. Yes, Your Honor. But all of the money should have flowed through the hands of a trustee. It doesn't have to be the trustees of this board. It could have been someone designated as a trustee to hold plan assets. But this money went directly to Mr. Doyle, and the fund had no adequate financial records. A trustee is responsible under Section 403 and 404 to hold assets in trust and to be able to account for those assets. One of the problems here is that this trustee, the trustees including Ms. Holloway, allowed this money to go through Mr. Doyle. As best we can determine, Mr. Doyle, at a minimum, under Check 1, $4.5 million should have ended up in the hands of the trust, regardless of whether you agree about the $2.1 million that he took as a marketing fee to market a scheme that had already been found to be illegal and did nothing but provide access to the health care fund. But of the $4.5 million that was paid through checks made payable to the fund, only $3.1 million was received by the fund, and that left $1.4 million. Okay, let's take that $3.1 million. That's from Check 1, right? Yes. Okay, and that went to PCINP, right? It went to PCINP, and I believe Mr. Okay, so it went to PCINP, and PCINP did what with it? Well, PCINP made certain additional deductions. Well, wait a minute, but didn't they forward it forward, $2.1 million to third-party administrators and medical providers? Yes, they did, Your Honor. Okay, so we know that some of it went to the providers. Some of it did, but at least $4.5 How much of it didn't go to the providers? Well I mean, you're talking money, but I'm trying to find out. From the Secretary, yes. We believe that at least $755,000 is missing from Check 1, and that that was diverted during the period where Mr. Doyle was actually forwarding all of the money. Okay, so we're talking now about not millions, but $755,000, right? Yes, and Your Honor, let me just address for one moment. The amount of money that is unpaid for claims may be different than the amount of planned assets that are diverted, because unpaid claims, there may have been an insufficient amount of money in the first place to pay all claims. What we're talking about here is not the amount of claims that were left unpaid. We're talking about the amount of planned assets that were diverted. Okay, is your I'm sorry. No, go ahead. Tell me if your case is as simple as the proposition I'm about to posit. $6.6 million should have been given to a trustee Yes. on behalf of the fund. Yes. And on behalf of the fund, if that $6.6 million in accord with ERISA regulations were then paid to appropriate parties, that would be in compliance with the Secretary's view of what the appropriate disposition of the $6.6 million should have been. That's absolutely right, Your Honor. Right? Yes. Okay. That may have left some, there still might have been insufficient funds, but that's not the case we brought. So in your view, the findings of the district court should have been as simple as follows. We don't care about what Mr. Doyle actually did. All we know is he did not live up to his fiduciary responsibilities because the $6.6 million didn't go straight to the fund through a trustee acting on behalf of the fund. Yes, exactly. And that trustee may have, it may have been appropriate to have given a legitimate marketer some fee, but this is not a legitimate scheme, and the money didn't flow to the trust. Well, I want to challenge you on that because if you go that far, then we shouldn't reverse the district court because if the district court disagreed with you on that basis, then we wouldn't come to the conclusion that you want us to come to, which is it's irrelevant where it went after it went to Mr. Doyle because it should have gone straight to the fund. Yes, it should have gone straight to the fund with a fiduciary to make disbursements as appropriate. So your review of the district court's opinion is as simple as the district court did not identify what plan assets were first. Yes. If the district court went through that exercise, they should have identified $6.6 million as plan assets, and the district court should have said, Ms. Holloway, Mr. Doyle, et al. did not act in their fiduciary capacities appropriately because the 6.6 should have gone to a trustee held on behalf of the fund. That's exactly right, Your Honor. It's as simple as that, right? And if plan assets are defined as Judge Greenaway has proposed, then Mr. Doyle would be a fiduciary under the plan because he was receiving plan assets. All of the money. Yes. Yes. The ERISA defines fiduciaries in functional as well as formal terms, and Mr. Doyle controlled plan assets under ERISA's definition of a fiduciary. If you control plan assets, you're a fiduciary. Okay. All right. Okay. Thank you very much. We'll hear from the other side. From Mr. McMurdy. Yes, good morning, Your Honors. Good morning. Are you here on behalf of both Doyle and Holloway? I'm appearing on behalf of both appellees. Thank you. Your Honors, as addressed here with Ms. Bowe's argument, I think that it's important for this Court to note that Judge Rodriguez does not have to get to the issue of whether or not the second check is a plan asset because the fundamental concern for a welfare benefit plan is whether or not the required contribution is being made in accordance with the plan terms and whether or not that money has come in and whether or not that money was used to pay claims. And there's undisputed evidence. We had a six-day trial, put the record in front of Judge Rodriguez, and what we showed was that March 2003, when this fund dissolves, there is no evidence that there were outstanding claims payable in March of 2003. I thought I asked that question. I mean, that was a question I thought I started with. Are there claims that haven't been paid? And we were told, yes, there are claims that haven't been paid. But when you're considering fiduciary duty under ERISA, isn't the important thing to determine what are plan assets and whether plan assets got paid into the fund? That is correct, Your Honor, but the question with respect to fiduciary duty is when you look at 404, it says, you shall administer the plan in accordance with its terms. You shall do whatever the plan requires. You shall pay whatever claims. You shall do it under a reasonable person's standard. And so when you look at the ultimate responsibility of the fiduciary, what is it to do? It's to make sure that the money gets in and that the claims are paid in accordance with the plan terms. So part one of establishing any claim for breach of fiduciary duty is to establish that somehow the requirements of the plan were not met. So you would break this first chain. The first link in the chain would be approached by saying, all right, first we have to establish that claims were not paid. No, first of all, don't we have to establish that the monies that should have been paid into the trust, into the plan, actually were paid into the plan if there were funds designated for the plan that did not get paid in? And that is absolutely correct, Your Honor, and in fact at trial it was proven that... But she said no to what you said and you say yes. I would like to... No, I don't think she said no. Okay. At trial it was established that more than $3 million was contributed to that fund, and it was also established that those contribution rates as set by the fund were met. So the issue here is not the required contribution as set forth by the plan document, as required by the trustees to collect. The issue is this extraneous money associated with services provided to a third-party entity by a third-party entity. And the Secretary of Labor is saying that she will... Is it the Secretary of Labor or she or he now? She. She, all right. The Secretary of Labor will establish that the funds that should have gone into the plan were, what, $6.7 million, and that the fact that some of these monies disappeared along the way and only $3 million got paid into the plan, that that is a breach of fiduciary duty. Well, and at trial, Your Honor, again looking at what occurred throughout the case presentation of evidence to Judge Rodriguez, what was established was that Mr. Doyle, the entity known as PCMG, had a service contract with an entity known as PCI Northpointe. All right? Mr. Doyle had no contract with the fund, had no contact with the fund, was not a contributing employer, was not retained by the fund for any purposes. He had a contract agreement with a separate entity that said, if you go and do these things for my entity, you will be paid this amount of fee, and this is how you will be paid. And he diligently went out and he did those things under the terms of that service agreement. Okay. Aren't you and Ms. Bove essentially arguing the positions that you argued to the district court that didn't get decided, that we need to have decided before we can determine whether there has been a breach of fiduciary duty? Well, and I think, Your Honor, that first of all, the arguments have been completely made and fleshed out. I think that the issue that Judge Rodriguez addressed was saying is for me to... I don't have to get to that issue of planned assets because there's no evidence here that Doyle had anything to do with the plan. So we start with point one over here with Doyle and say, wait a minute, in order for you to be... that you've collected to determine whether or not they're planned assets, I need some evidence before me. All right, and the Secretary of Labor presented evidence of checks sent to Mr. Doyle that were made out to the plan, right? Correct. And it's the position of the Secretary of Labor that these are planned assets. Correct. And the fact that they never got to the plan is in the interpretation of the Secretary of Labor a breach of fiduciary duty. But, Your Honor, at trial, the evidence was that the checks payable to the plan went into the plan. The issue is the checks... the second check, the check not payable to the plan, the check payable to PCI or to PCMG. That's the issue that they're presenting here is they're saying this other check that wasn't written to the fund wasn't put into the fund. But they're also saying that of the checks written to the fund, there was some $700,000 that never made it to the fund. Well, and I say that, Your Honor, from the perspective of oral argument, today is the first time that number has been presented. Well, I saw it in the briefs. Yeah, and I would say that Judge Rodriguez didn't see it at trial, Your Honor. So that was the contention of the parties putting forth the evidence was saying, all right, if you're going to establish that $700,000 is missing, show where it went. But before you get to the $755,000, you said something a few moments ago that I thought that Judge Roth had asked the Secretary about, and there was an entirely different perspective, and that is you said, I thought a couple moments ago, that $3.1 million went right to the fund. Is that right? That's correct. Okay. So if I understood Ms. Bove, I hope that's how we pronounce it as opposed to Bouvet, but Ms. Bove said that of that $3.1 million, nothing went right to the fund, that a good amount of that, I believe 2.7, and then I think she changed to the entire 3.1, went to third-party administrators, and that the Secretary has two problems. Number one, if it was a fund asset, a plan asset, it should have gone to a trustee on behalf of the fund, and number two, even if it went to ultimately pay health care claims or it went to third-party administrators, that that's not the route that the money should have gone, and the fact that it did go that way is a violation of the fiduciary duty of Mr. Doyle. Your Honor, I would counter that and say that the money, the third-party administrator is the entity for the multi-employer fund that is responsible for the collecting of the money and the payment of claims. So when you say the check was made, the check was received by the third-party administrator, it is effectively the fund. That is the entity that pays the claim, therefore it needs the assets. So what we're talking about here is, over the course of the trial, demonstration that a significant sum of money, not only, this is just 3.1 from this employer. There were other employers that contributed so that over the life of the fund, there's an excess of $5 million contributed that goes out to pay claims. So if it's going through the third-party administrator, they're taking it in, they're receiving checks from PCI Northpointe, they're receiving checks from Employers Depot, from any other contributing employing entity. The administrator is taking that money, cashing those checks, processing claims, sending it out to providers for payment. The normal operation of a health fund. And throughout the course of the trial, it was demonstrated repeatedly that money was going into the fund, that there was no evidence that it was money lower than required contribution rates by the fund documents, and that there was evidence that the money was going out to pay claims. Let me ask you this. Check 1 is $4.5 million, is that right?  I'm not very good with numbers, Your Honor, but my recollection is check 1 is a number that is required to go into the fund. This is a strange case for a lawyer to say I'm not very good with numbers. The whole case is numbers. It's the recalling them instantaneously. Okay, well, I like numbers. So you'll accept for the moment $4.5 million. Okay. Right? So you also agree, despite whatever you think of math, that there's a difference between $4.5 and $3.1? Yes, Your Honor. Okay. Tell me what happened to $1.4? Well, the $1.4 is the infamous second check. No, no, no. Okay. As I understand it... Your Honor, $4.5 total... There are two checks adding up to $6.6, right? Correct. So we can do that? Yes. $4.1, $2.5? Okay. Go ahead. So the second check goes to the other services provided by PCR... No, I know that goes to PCMG. I got that. I'd like you to tell us what happened to $4.5 minus $3.1. That money, where did that go? Yes, that other is from other employer contributions. The $3.1 is just this narrow silo of fund contributions. There are other employers that contributed to this fund. So over the life of the fund, it collected significantly more than $3.1 million. Okay. So you're saying that check one ultimately all went to the third-party administrator to be dispersed on behalf of the fund? Yes. And that's what the proofs were at trial? Yes. And the reason that there is this difficulty with the case is because that only one of the contributing employers operated in this fashion, the check one, check two. The other contributing employer simply remitted a single check to the plan administrator. Now, we're only talking about Doyle right now. Yes, Your Honor. Okay. Your time has run, but maybe we ought to talk about Holloway a little bit? Well, Your Honor, the aspect of Ms. Holloway is she sits as a trustee on this fund and, again, coming back to contributions. So the trustee says my responsibility is to make sure contributions are made in accordance with the terms of the fund document, to make sure claims are being paid in accordance with the terms of the fund document, to make sure that participants' interests are protected. And throughout her status as a trustee, there's no indication that those three weren't met. Well, what about all the states that were declaring this scheme to be an illegal insurance scheme? Your Honor, the orders were issued against entities who were ostensibly selling the fund as if it were insurance. So they were saying is you cannot sell the fund in this state. And the evidence from trial is clear that when those orders were issued, Ms. Holloway immediately took those orders to the fund council and said these have to be addressed. So the fact that some other, this PCI Northpointe, was doing this or PCMG was doing this, the fund was not doing it. So the trustees sit and say, all right, what is our obligation? We collect the money, we pay the claims. And you say, well, find out, this guy is over here in Oklahoma selling the fund as insurance. That's a violation of Oklahoma law. So the order comes in and she hands it to the attorney for the fund and says, fund attorney, address this. And that's the way that the trustee is responsible. So the function here is being said to Ms. Holloway, well, you breached your fiduciary duty. We can't point to any claims that weren't paid. We can't point to any contributions according to fund documents that weren't made. But there's just something here that because we don't like the fact that this other entity, unrelated to the fund, was selling your fund as an insurance, therefore you have violated your fiduciary duties. And when we hearken back to that hallmark component is, what are they supposed to do? Protect the participants. And until there's demonstration that the participants suffered a harm as a result of her failure to act, then there's no breach of duty. Well, when you look at check two, as I understood the Secretary's argument, the fact that check two went to PCMG, number one is a violation of ERISA because that money should have gone straight to the fund. That's number one. And number two, it's an example of how Ms. Holloway abrogated her responsibilities as a trustee because when she went to, I guess, the three meetings, she should have been, in their words, well, they didn't say diligent, there were other words they used, but essentially should have been more diligent in her questioning and following up as a trustee on behalf of the fund. Your Honor, again, back to this check two. Yeah. The check two is a transaction that occurs between two entities who are not the fund. Okay? So there is no way for the trustee sitting in the fund to know about this check two. And, in fact, the evidence at trial was very clear. Ms. Holloway did not know about check two. Should she have known about check two? She had no relationship to those parties, Your Honor. Well, was there a representation by Mr. Doyle that the acquisition of those funds was going to be or was purported to be on behalf of the fund? Mr. Doyle had no relationship to the fund, was not employed by Ms. Holloway. Her knowledge of what Mr. Doyle may or may not have been doing, she has no contact with him. So the fact that PCI North- So help me for a second. I'm going to interrupt you because- Yes, Your Honor. You know, I used to like cross-examination. Just answer my question, though, please. Did he represent that in his acquisition of those funds that it was on behalf of the fund? No. Okay. He represented the turn-in form that they speak of, the contracts that they dealt with, represent that the money is being contributed to PCI Northpointe for the purposes of whatever was under the terms of that service agreement with PCI Northpointe. And the fact that a portion of that money had to go to the fund was in accordance with PCI Northpointe's collective bargaining agreement and its contribution obligation to the fund. The letter that Ms. Holloway wrote, her resignation letter on September 20, 2002, the reason for her resignation, does the knowledge and failure of a trustee to act on these consist of a breach of fiduciary duty? Well, Your Honor, again, we apply the standard looking back to the circumstances at the time they occurred and not in hindsight. So we look at the completeness of the facts and saying these things are occurring. So when she resigned, she said, I'm not comfortable with the way that the fund is being operated. But the critical component is that the other trustees were taking actions without her input and doing things outside of her recommendations that she said, I can no longer serve as a functioning trustee. But she did not forego her fiduciary obligation to the fund. But wasn't part of her fiduciary obligation to bring these concerns to the attention of the Secretary of Labor or if she resigned to make sure that a competent trustee replaced her? Well, Your Honor, if you say, again, looking back and saying, what are the ultimate things that can be done? Well, she brought them to the attention of the fund's attorney. She brought them to the attention of the third-party administrator. She brought them to the attention of the other trustees. She brought them to the attention of the actuary. She said, I'm no longer going to be a trustee on this fund. And then she continued to work diligently to make sure that outstanding claims were paid. And when we get to the end of March 2003, the fundamental question is, are there any outstanding claims that remain unpaid? Which is the question I asked. Where does it say in the appendix that all the outstanding claims have been paid? Your Honor, it doesn't say that all outstanding claims have been paid. That's what I understood. It says there's no evidence that there are outstanding claims. But there was a lot of evidence that there were outstanding claims earlier when the first-plan administrator resigned, correct? Well, Your Honor, yes. And, of course, in an operating welfare fund, there are a continual flow of outstanding claims. But they were delinquent claims. They were backlogged and had not been processed. And so the question is, when those get through the system, you know, you have to check eligibility. You check whether or not it's a covered service. You check whether or not it's a duplicate claim. You reprice it at the appropriate payment amount. Should the fact of what claims were paid or not have been brought to the attention of the court? Yes, definitely. And whose burden was it to bring that evidence before the court? That burden would be on the party bringing the claim that claims were not paid. If you're going to bring a claim for breach of fiduciary duty, you have to first establish the duty that was breached. So we look at the fiduciary obligation, administer the plan in accordance with its terms, pay claims on behalf of participants. If an individual participant had brought this cause of action instead of the Department of Labor, the first question the court would ask it is, well, what are your outstanding claims that weren't paid and why should they have been paid? So in this situation, the Secretary of Labor says, I'd like a pass on that obligation. I can just say, listen, I think there's unpaid claims. You have to prove they were all paid. That's not the way the system operates. I thought that my take on Judge Roth's question with regard to the resignation letter goes right back to the district court opinion, and that is that in outlining the reasons that prompted her to resign, she talked about lack of financial accountability for contributions to the fund, resultant lack of funding to pay claims, described as vulnerability of the fund due to actions taken by membership that has created insolvency of the fund. Now, I know that the district court had that before him, but isn't that something that is kind of a red flag here? Well, it certainly is. This is a fiduciary, again, resigning the trustee position but not surrendering her fiduciary capacity. So she resigns as a trustee but continues to hold that fiduciary obligation. That's the essence of your fiduciary status. Just because you're named as a trustee, that's not the only fiduciary. It wasn't part of her fiduciary duty as trustee to make sure that she was replaced by a competent trustee before she actually resigned. Well, then you would have to look at the trust document which talks about resignation and replacement. I'm not talking about the trust document. I'm talking about general fiduciary duty under ERISA. Well, Your Honor, that may be the case, except that presumes that those are the rules that the trust allows. Well, can a trust create fiduciary duties different from the basic fiduciary duty recognized as a responsibility of a fiduciary of an ERISA plan? Well, Your Honor, if Ms. Holloway were the sole trustee, I would say that that would be a much higher obligation. But we don't know who the other trustees were. Well, there were at least three others at the time. Who were they? I apologize, Your Honor. I'm thinking it's a garnet, an unnamed party. I can't remember. It's an old gentleman who used to be with the Pennsylvania State Fund and Macarella. Because one of the things she's complaining about are the other three trustees taking actions without her knowledge. Correct. And so is she then resigning and letting these other three trustees run the thing when she's concerned about their failure to consult her with what they're doing? Well, what she's saying is if you're not going to value my input as a trustee, then you go ahead and replace me with a trustee that you want. And as long as the claims are being paid, as long as the contributions are being made, the fund is operating in accordance with its terms. And so after her resignation in September of 2002, again, the evidence at trial, very clear, and in fact Judge Rodriguez makes reference to it in his opinion, is that after she resigned, she continued to take all of these actions to ensure that claims were paid, the contributions were made, and that the fund was being properly administered. Should the district court have made a determination of what were planned assets? Again, Your Honor, I don't believe that the court has to get to that issue because the district court said the threshold issue is you need to establish for me that somehow 404 was not satisfied. Either it's not being administered in accordance with its terms or claims aren't being paid. And since that evidence is lacking, Judge Rodriguez need merely say, look, I find that 404 was satisfied. Your Honor, and I think Judge Sloviter, when the Ruberton decision says it, in one of it says, you know, you have to have notice of the issue. You have to have notice of a delinquency to be liable for the delinquency. And in this situation, for Holloway and Doyle to be liable, they have to have notice of what these things are. What is going wrong? What is happening that constitutes a breach? And in this case, Judge Rodriguez sat through the trial, got to the end of it, and said, look, you have the burden of establishing that somehow 404 was violated. You didn't. I don't have to get to the extraneous issues about whether or not our plan assets. If the trust had assets in it in March of 2003 and dissolved, the trust would be legally obligated to remit those extra monies back to the contributing employers. Thank you. We have been, we've given you a lot of time, but we have a really important case, a constitutional case, right after this. Thank you, Your Honor. I'm going to have to cut off my colleagues. Ms. Bowe, you have five minutes. Let me keep it at five. Your Honor, most of the cases that are in the brief submitted on behalf of Holloway involve benefit cases. They're not fiduciary breach cases. As this Court ruled in Ream v. Fry, fiduciary responsibilities are not set by contract. They're set by statute. Mrs. Holloway's principle, her first breach, was allowing funds to flow through the hands of both Mr. Doyle and then PCIMP, and after it collapsed, Mr. Doyle handled both checks. The only money that is at issue in this case is the money Mr. Doyle collected. He exclusively collected every penny collected on behalf of participating employers at issue in this case, and that was $6.6 million. Mr. Doyle then, there are no other employers, participating employers at issue other than those Mr. Doyle dealt with. He never disclosed to those employers that any money would be pocketed by him for a marketing fee, let alone the magnitude of that fee, or that any other deductions would be made by PCIMP. Is it your position he wasn't allowed to take any of that money? I'm sorry, Your Honor? Is it your position he wasn't allowed to take any of that money, he wasn't entitled to? Well, our position is that with respect to his marketing fee, he was marketing an illegal scheme, and under the unique circumstances of this case, we do not believe he was entitled to take a marketing fee at all when he did not provide a service. And he was well aware because at least by January of 2002, the State of Oklahoma, and he was served with that cease and desist order by February of 2002, and successively thereafter, several other states enjoined this marketing scheme. He was well aware of that. I also want to point out that it is the responsibility of Mrs. Doyle to have, I'm sorry, Mrs. Holloway, to have established an appropriate administrative structure for this fund that would have required the money to flow through a fiduciary, a trustee responsible for all of the assets collected from these participating employers. That fiduciary could then determine how money would flow thereafter. Would you very clearly state what you think, what error you think the district court committed? The district court failed to apply the appropriate standard of care to facts the district court itself found regarding Mrs. Holloway's conduct, including her failure to ensure that financial records were created and maintained,  as the district court itself found as early as May of 2002. She was informed by the second contract administrator that the first contract administrator had not provided her, provided the contract administrator with any expense records for the fund or any claims records. That never changed. She was aware of that when she resigned. She did nothing to resolve that problem. Had she created an appropriate administrative scheme that would have ensured that plan assets flowed to the contract administrator in the first instance and then appropriate disbursements could have been made thereafter, Mr. Doyle could never have diverted the money that he diverted. The resignation itself, knowing what she knew, to have resigned under the circumstances without taking any appropriate actions to ensure that even claims records and financial records existed for the fund without bringing what she herself described as chaotic circumstances of the fund to the attention of the Department of Labor or actually initiating action against the initial contract administrator or any of the other trustees was itself a breach of fiduciary duty. So you see the resignation letter as admission number one, that she had breached her fiduciary duty. Yes. And she details exactly the circumstances that should have led her to understand that leaving the fund in this condition was a breach. The district court also erred by failing to reach the question of whether or not Mr. Doyle was a fiduciary who handled plan assets. It erred by failing to address the question of what constituted plan assets and whether Mr. Doyle was a fiduciary based on his control. He controlled every penny that came into this fund. He obviously controlled plan assets. Thank you. Your red light is on. Can I ask one quick question? Yes, go ahead. Whose responsibility was it or was it relevant whether all claims had been paid and if so or not, whose responsibility was it to bring it before the court? Number one, it's not relevant to the ultimate issue of liability, which is the diversion of plan assets. But number two, the fiduciary at all times is responsible for accounting for assets entrusted to the fiduciary. It is abundantly obvious on this record there are no meaningful financial records for this plan or claims records, and that is the burden of the fiduciary to whom plan assets have been entrusted. You answered my question. Thank you. We'll hear the next case. Thank you. We'll take you, Senator Cosman.